UNITED STATES of America, Appellee,

v.

Harold B. KAIL, Appellant.

No. 85–5190.

United States Court of Appeals,
Eighth Circuit.

Submitted April 16, 1986.

Decided Oct. 29, 1986.

442

---

Kenneth Swinger, Fort Lauderdale, Fla., for appellant.

Donald M. Lewis, Asst. U.S. Atty., Minneapolis, Minn., for appellee.

Before ROSS and ARNOLD, Circuit Judges, and HANSON,* Senior District Judge.

HANSON, Senior District Judge.

Kail appeals his conviction on fifteen counts of mail fraud, in violation of 18 U.S.C. § 1341. Kail was sentenced on May 30, 1985 to serve a total of seven years imprisonment and ordered to pay restitution in the amount of $501,738. We affirm the decision of the district court.[1]

## I. BACKGROUND.

From April 1983 to March 1984 Kail was president of Coin & Stamp Gallery, Inc., a Minnesota corporation dealing in the sale of investment quality coins. Kail was responsible for hiring personnel, and in this capacity recruited several brokers and other employees from his former employer, Investment Rarities, Inc. The brokers contacted their former Investment Rarities clients, usually by mail, and informed them that they now worked at Coin & Stamp Gallery. One letter, drafted by Kail, described him as "one of the most knowledgeable numismatic experts in the country." The brokers informed customers that Coin & Stamp Gallery dealt in the finest investment quality coins which would provide a much better investment than the lower-grade coins and bullion offered by Investment Rarities. Throughout all of their dealings with their customers, Coin & Stamp Gallery brokers emphasized the investment potential of rare silver and gold coins, although Kail did caution them that they were not to sell the coins as securities or represent that profit was guaranteed.

Customers purchased coins from Coin & Stamp Gallery brokers based upon the representations that this would be an excellent investment in that the coins were sold at their fair market value. The fair market value of coins sold to customers was often confirmed by letter. In addition, Coin & Stamp Gallery assured its clients that it would repurchase coins at their current market value if the client wanted to sell them later. Subsequent appraisals of the coins purchased by Coin & Stamp Gallery clients, however, established that many of the coins had been purchased at a price far in excess of the fair market value, making them almost worthless as an investment vehicle. In most instances the price listed on the broker's inventory sheets was two to three times higher than the price at which Kail originally purchased the coins, therefore misleading the sales personnel as to the true value of the coins they were selling.

After individual customers had brought numerous complaints about the fraudulent transactions, the government conducted additional appraisals of the coins. To determine the market value of a particular coin and its condition ("mint state"), the appraisers routinely consulted The Coin Dealer Newsletter, commonly referred to as "the gray sheet." The gray sheet reports on a weekly basis the wholesale and retail price of coins traded nationwide by hundreds of coin dealers. Dealers commonly mark up the retail price of coins 20 to 30 percent above cost.

Not only were the coins being sold at prices far above their market value, they were also being sold at prices significantly higher than those recommended by Kail's chief supplier, George Manter. Although he initially sold coins to Kail, Manter decided to provide coins to Kail on a consignment basis, and with Kail decided the maximum price at which they would be sold. However, coins consigned by Manter appeared on the Coin & Stamp Gallery inventory with grades and sales prices much higher than agreed to. For example, in October 1983 Manter consigned a 5–piece silver dollar set at an agreed-to price of $1,950; the Coin & Stamp Gallery inventory sheet listed the set at $12,000.

* The HONORABLE WILLIAM C. HANSON, Senior District Judge for the Northern and Southern Districts of Iowa, sitting by designation.

1. The HONORABLE DONALD D. ALSOP, Chief Judge, United States District Court for the District of Minnesota.

444

To his brokers' questioning as to why Coin & Stamp Gallery prices were so much higher than those of comparable coins listed in the gray sheets, Kail insisted that his profit margin was low and that the coins he sold were of particularly rare quality. However, doubts among Coin & Stamp Gallery brokers increased in early 1984 after several customers complained and requested refunds of their purchases. In several instances, Kail refused to repurchase coins at the request of customers.

On March 6, 1984 postal inspectors, investigating complaints of mail fraud, executed a search warrant at the Coin & Stamp Gallery offices. Among the business records seized was the Coin & Stamp Gallery commission ledger in which Kail's wife, Maggi, had recorded the actual purchase price of the coins. Postal inspectors also seized Coin & Stamp Gallery's inventory of coins. This inventory, including thousands of coins, was examined by two coin experts retained by the government. Their appraisals revealed that Kail had assigned sale prices to coins substantially higher than their fair market value.

## II. DISCUSSION.

### A. *Search Warrant.*

Kail asserts that the trial court erred in denying his motion for suppression of evidence seized at Coin & Stamp Gallery because the affidavit accompanying the search warrant did not contain sufficient substance to allow the magistrate to determine probable cause and because the warrant was lacking in sufficient particularity and therefore constitutionally defective. The district court denied the motion to suppress, finding initially that there was sufficient probable cause to support the issuance of the warrant.

■■■ A magistrate issuing a search warrant is to "make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, ... there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v.*

*Gates,* 462 U.S. 213, 238, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527 (1983). In reviewing the magistrate's determinations, the court insures that the magistrate had a "substantial basis" for concluding that probable cause existed. *Id.* at 238–39, 103 S.Ct. at 2332.

■■■ The affidavit attached to the search warrant in this case reveals a substantial basis with which the magistrate could have concluded that the defendant's conduct was probably fraudulent and in violation of the federal mail fraud statute. The affidavit relates several specific examples of individuals who had been sold coins at prices far in excess of their fair market value. Three customers named in the affidavit indicated that Coin & Stamp Gallery refused to honor its commitment to refund coin purchases. The affidavit also includes information from interviews with Coin & Stamp Gallery employees who stated that numerous complaints had been received regarding the firm's pricing practices. Finally, the affidavit states in detail how the United States Mail was used in furtherance of the defendant's transactions, and describes the types of records kept by the business and how they were retained in the corporate offices. We would therefore conclude that the affidavit attached to the search warrant stated a substantial basis with which the magistrate could determine there was probable cause to issue the search warrant.

Kail also attacks as lacking sufficient particularity the warrant's description of the five categories of business records to be seized. The district court disagreed, and stated that the "scope of the documents sought by the warrant was ... not unreasonable or excessive, and therefore did not authorize an exploratory search."

■■■ The search warrant authorized inspectors to seize: (1) evidence of mailings of coins in bullion shipments; (2) books, records, papers and documents relating to the sale and purchase of coins and bullion; (3) accounting ledgers or records, checkbooks, monthly statements, cancelled checks, and deposit slips; (4) inventory records, records of safety deposit boxes,

safety deposit keys and coins; and (5) customer files, client lists, letters and mailings from clients, checks, cash, coins or bullion shipments sent as payment for purchases and advertising materials. The fourth amendment requires that a search warrant describe with sufficient particularity the things to be seized in order to prevent "a general, exploratory rummaging in a person's belongings." *Coolidge v. New Hampshire*, 403 U.S. 443, 467, 91 S.Ct. 2022, 2038, 29 L.Ed.2d 564 (1971). The degree of specificity required in applying the particularity requirement "is flexible and may vary depending on the circumstances and the types of items involved." *Marvin v. United States*, 732 F.2d 669, 673 (8th Cir.1984), *quoting United States v. Apker*, 705 F.2d 293, 299 (8th Cir.1983). For use involving a scheme to defraud, therefore, a search warrant is sufficiently particular in its description of the items to be seized "if it is as specific as the circumstances and nature of activity under investigation permit." *United States v. Wuagneaux*, 683 F.2d 1343, 1349 (11th Cir.1982), *cert. denied*, 464 U.S. 814, 104 S.Ct. 69, 78 L.Ed.2d 83 (1983). While the search warrant in this case was broad in the sense that it allowed inspectors to seize almost all of the business records of Coin & Stamp Gallery, we would conclude that under the particular facts of this case the scope of the warrant was justified. This is because it would not be possible through a more particular description to separate those business records that would be evidence of fraud from those that would not since there was probable cause to believe that fraud permeated the entire business operation. We would therefore affirm the district court's finding that the warrant was sufficiently particular.

In denying the defendant's motion to suppress, the district court concluded that "[t]he reliance of the postal inspectors on the magistrate's determination of probable cause was objectively reasonable." In addition, the court stated that the postal inspectors did not exceed their authority in executing the search warrant. Since the record establishes that the postal inspec-

tors acted in good faith in obtaining the search warrant, and acted within the warrant's scope, the district court did not err in denying the motion to suppress.

**B.** *Fraud and Kail's Good Faith Defense.*

■ Kail asserts that there was insufficient evidence to support the jury's verdict in light of the fact that there were honest differences of opinion and judgment as to the grade and value of the coins, therefore furnishing no basis for a finding that the defendant had committed fraud. He maintains that because the valuation of coins is inherently subjective, it cannot be fraud to sell coins at high prices. Appellant, however, mischaracterizes the nature of the charges against him. He was not charged with marking up the prices of the coins, but with misrepresenting the coins as valuable investments. In the record before us, the evidence demonstrates that Kail's representations with regard to the market value of the coins were false, and that these representations were made with an intent to defraud.

The evidence established the existence of official grading standards promulgated by the American Numismatic Association which, while not having the force of law, were recognized by the government's experts as having wide acceptance in the industry. Moreover, The Coin Dealer Newsletter ("the gray sheet") is almost universally relied upon by dealers to determine current market value of coins. Therefore, Kail's assertion that there is an absence of standards in the industry must be in doubt from this record.

In addition, in spite of the fact that the coin grading process is inherently subjective, the experts' appraisals of coins sold by Kail's firm were consistent in demonstrating a pattern of over valuation. In some instances, the markups exceeded the cost tenfold. As a result, the jury could reasonably infer that the pricing practices of Coin & Stamp Gallery were so far beyond the limits of custom and practice in the industry as to constitute mail fraud.

Finally, even if there were reason to believe that the subjective nature of the coin valuation process would make it difficult to prove criminal fraud, we nonetheless conclude there was abundant evidence presented that Kail operated his business dishonestly. He misled his brokers as to the cost basis of the coins that they were selling. His records reveal the actual cost of the coins had been concealed. Kail even deceived his chief supplier by marking up grades and prices of consigned coins without apparent justification. And when customers, alerted to the fraud, demanded refunds, Kail refused on several occasions to honor his buy-back guarantee.

We would therefore conclude the jury could reasonably find that Kail's pricing and sale of the coins was not conducted in good faith and amounted to mail fraud.

### C. *Postal Service Decision.*

Kail asserts that the trial court erred in excluding a 1977 Postal Service administrative decision in which the administrative law judge found that there were no industry-wide standards for the grading and valuation of coins. *Security National Rare Coin Corp. and Riverside Coin Co.,* Postal Service No. 5/130 (May 10, 1977). Kail offered the administrative decision in order to establish that the Postal Service acknowledged the absence of uniform coin grading standards and that in this prosecution the Postal Service was violating its own policy. The district court sustained the government's objection on hearsay and relevance grounds. On appeal, Kail argues that it was error to exclude the evidence since the administrative decision was admissible as a public record under Rule 803(8) of the Federal Rules of Evidence, and was relevant in that it supported his claim of good faith.

■ To be admissible under F.R.E. 401, the *Security National* decision must be probative of a fact of consequence in this case. The trial court noted that the opinion proffered by Kail was dated 1977 and the testimony in this case indicated that there had been standards developed since that date by the American Numismatic Society which have been widely accepted by experts in the field. In addition, the district court noted that the finding of an administrative law judge in 1977 in a totally unrelated proceeding did not bear any relevance to the issues or was a proper way to decide issues involved in this case. The record before us demonstrates that Coin & Stamp Gallery was not incorporated until 1983. In addition, Kail himself utilized the standards promulgated in 1977 by the ANA in his grading of coins. Moreover, there is no evidence presented that Kail was in any way aware of the administrative law judge's decision until the time of his own trial. The administrative decision, therefore, was not relevant to any issue of consequence in this trial.

In addition to the administrative decision's marginal relevance, we believe that the district court properly excluded it because its probative value was substantially outweighed by the danger of misleading or confusing the jury. F.R.E. 403. We believe that it is implicit in a situation in which an administrative decision is submitted as an exhibit to the jury that the jury would be forced to decide legal rather than factual questions. Moreover, it is apparent that allowing Kail to introduce the opinion into evidence might well have distracted the jury from the real issue in this case—Kail's intent to defraud. We believe that Kail had ample opportunity to present his good faith defense through his extensive cross-examination of experts, who were able to describe the prevailing practices among coin dealers during the relevant time period. We would therefore conclude that there was no prejudice to his case by the exclusion of this evidence and would affirm the decision of the district court.

### D. *Coin Inventory.*

■ Kail first objects to the district court's finding admissible the appraisals of coins seized from Coin & Stamp Gallery by expert witnesses John G. Ross and Kent Froseth. He asserts that in light of the fact that there are no industry-wide stan-

dards for grading and value of coins, expert testimony as to the fair market value of his inventory is suspect and inherently unreliable. However, because these expert witnesses base their appraisals on the standards developed by the ANA (the same standards used by Kail), it is apparent that the reliability of the appraisals is not a sufficient reason to exclude the evidence. Moreover, the relevance of the appraisals of the inventoried coins is readily apparent in that this evidence was used to demonstrate that the prices Kail set on the coins in stock were five times greater than the experts' appraised market values. We conclude that the district court was well within its discretion under Rule 401 in allowing into evidence the appraised value of the coin inventory.

 Kail further alleges that the use of expert testimony, in lieu of production of the actual coin inventory at trial, violated his right to confront witnesses against him. After the coin inventory had been seized by postal inspectors, Kail filed a Rule 41 motion to quash the subpoena and seek return of the coins. The district court permitted the government to have the inventory appraised, but ordered all of the inventory returned, except for a representative sample, following the appraisals. The court's order provided that the production of the coin inventory would not be required at any subsequent trial in order to establish foundation for the introduction into evidence of appraisals for the coins. The government thereafter returned the inventory to Kail. At trial Kail objected to the introduction of government witness testimony concerning their appraisals of the coin inventory, asserting that because the government could not produce the inventory in court admission of the appraisals was without foundation and violated his right to confrontation under the sixth amendment. The district court overruled his objection, stating "he is hardly in a position to be complaining that he doesn't have custody of the coins when in fact they were returned to him or the company of whom he had absolute control." (Tr. 281.) The sixth amendment is not offended when there is reliable second-

ary evidence as a substitute for the physical evidence. *See United States v. Benedict,* 647 F.2d 928, 931–32 (9th Cir.1981). In such cases, the availability of cross-examination safeguards the right to confrontation. *Id.* at 932. Moreover, the Confrontation Clause is not offended when the criminal defendant has access to the underlying data. *United States v. Lawson,* 653 F.2d 299, 302–03 (7th Cir.1981). In this case Kail was responsible for the absence of the actual coins from trial. He had the opportunity to obtain his own appraisals of the coins, but chose not to. Furthermore, the expert witnesses were cross-examined with regard to the basis of their valuations of the inventoried coins. Therefore, the district court could correctly conclude that the government's failure to produce the coins at trial did not amount to a denial of Kail's right of confrontation.

### E. *Expert Opinions.*

 Kail first asserts that the district court erred in finding admissible testimony of a type not "reasonably relied upon by experts" under Rule 703. He asserts that the lack of a single, official standard for the grading of coins which had been accepted by, and binding on, all coin dealers and collectors necessitated that the judge determine initially whether the facts and data relied upon by the experts were reasonably relied upon by other experts in the field. Rule 703 does not exclude opinion evidence based upon personal observation, and the second sentence of the Rule applies only when the expert relies on nonadmissible data—for example, hearsay. *See United States v. 1014.16 Acres of Land,* 558 F.Supp. 1238, 1242 (W.D.Mo. 1983), *aff'd,* 739 F.2d 1371 (8th Cir.1984). The opinions in this case were based on admissible evidence—that is, the experts' direct examination of coins purchased or otherwise obtained from Coin & Stamp Gallery. The experts' valuations were therefore based on information "perceived by or made known to him at or before the hearing" as required in F.R.E. 703, and were admissible.

Even if the ANA grading standards and the gray sheet were inadmissible hearsay, the record in this case does not support Kail's assertion that rare coin dealers do not rely upon them in reaching conclusions regarding the value of rare coins. To the contrary, each expert stated that ANA grading standards enjoyed almost industry-wide acceptance, and that the gray sheet is recognized as the chief guide to the current price of rare coins. In the final analysis, the defendant's questions as to the reliability of the experts' judgments go to the weight to be given the to the testimony, and not to the admissibility of the testimony. We therefore conclude that the district court did not err in admitting the expert testimony to the jury under Rule 703.

 Kail further maintains that the court erred in refusing to require the government to establish a full and complete foundation for its expert testimony in order to support the experts' opinions that the coins sold by Kail were overgraded and/or overvalued. On direct examination, the government established each expert's qualifications as a professional numismatist, and asked each expert to explain the process of grading and pricing the rare coins each evaluated. Moreover, the court accorded wide latitude in the length and scope of Kail's cross-examination of all the government's experts. Rule 705 contemplates that "[t]he weaknesses in the underpinnings of such opinions may be developed upon cross-examination and such weakness goes to the weight and credibility of the testimony." *Polk v. Ford Motor Co.*, 529 F.2d 259, 271 (8th Cir.), *cert. denied*, 426 U.S. 907, 96 S.Ct. 2229, 48 L.Ed.2d 832 (1976). As a result, the district court ruled correctly that Rule 705 did not preclude admission of the testimony.

 Kail further maintains that the expert testimony should have been excluded because it was prejudicial, confusing, and precluded him from obtaining a fair trial. Nothing in Rule 403 suggests that expert testimony should be excluded simply because it is adverse to the opposing party. *See Wade v. Haynes*, 663 F.2d 778, 783 (8th

Cir.1981). We have considered the appellant's argument and have concluded that the district court has committed no error, and furthermore that the probative value of this evidence far outweighed its prejudicial effect.

### F. *The Commission Ledger.*

Kail contends that the trial court erred in admitting Government Exhibit 25-11, the commission ledger of Coin & Stamp Gallery, under exceptions to the hearsay rule. During the execution of the search warrant at Coin & Stamp Gallery, postal inspectors seized a black ledger book from the office of Maggi Kail, the defendant's wife and the firm's bookkeeper. The ledger recorded commissions earned by each broker in 1983 and 1984. The ledger listed by broker the purchase price as well as the base and sale price of the coins. Outside the hearing of the jury, the trial court conducted a lengthy inquiry with regard to the admissibility of the ledger. The court received the ledger into evidence, ruling that the government had laid sufficient foundation to establish its authenticity and overruling the defendant's hearsay objection, concluding that the ledger was a business record within Rule 803(6) and that the ledger possessed circumstantial guarantees of trustworthiness under Rules 803(24) and 804(b)(5). Kail argues on appeal that the admission of the ledger book was an abuse of discretion amounting to reversible error.

 Although Maggi Kail prepared the ledger, she was unavailable as a witness. Foundation under the business record exception to the hearsay rule may be supplied by a custodian of records or "other qualified witness" who has no personal knowledge regarding the creation of the document. *Ford Motor Co. v. Auto Supply Co., Inc.*, 661 F.2d 1171, 1175-76 (8th Cir.1981); *United States v. Page*, 544 F.2d 982, 986-87 (8th Cir.1976). Foundation under Rule 803(6) may also be established by circumstantial evidence, or by a combination of direct and circumstantial evidence. *See Itel Capital Corp. v. Cups*

*Coal Co., Inc.,* 707 F.2d 1253, 1259 (11th Cir.1983).

In this case, although Toniann Mathison did not herself compile the ledger, she was in a position to authenticate the ledger and to attest to its reliability as a business record. As receptionist at Coin & Stamp Gallery, she prepared the invoices which contained the sales data recorded in the ledger. These invoices were then provided to Maggi Kail, and Mathison routinely observed her record information from the invoices into the ledger. One of the brokers at Coin & Stamp Gallery corroborated her observations, stating that he had seen Maggi Kail work with the ledger in her office, and testified that the commission figures recorded in the ledger appeared accurate.

The hearsay admissions of Maggi Kail herself, testified to by postal inspectors, established that the ledger was a business record. During execution of the search warrant, she reviewed a list of records which were to be taken by the postal inspectors. As part of her request to have some of the materials photocopied, she identified the ledger as a document she would need to conduct business at Coin & Stamp Gallery. Moreover, the entries in the ledger corresponded to sale and price information contained in invoices already in evidence. At trial, brokers recognized and identified names of clients recorded in the ledger. In addition, the "bought at" prices listed in the ledger were consistent with purchase price information introduced through Kail's supplier, Manter. Furthermore, Kail's admission to an employee, Marcia Brooks, that the base price listed in the inventory sheet was not the actual price implied that the "bought at" information was maintained in some record not available to the sales staff.

It is also apparent that the ledger was admissible under the residual exceptions of Rules 803(24) and 804(b)(5) because the ledger possessed "circumstantial guarantees of trustworthiness." The ledger was prepared by Maggi Kail in the normal course of business at Coin & Stamp Gallery with no apparent incentive to present false information. Added to this, the government presented a substantial amount of corroborating evidence in the form of invoices and testimony of other employees indicating that the ledger was credible evidence.

Finally, we do not believe that there is merit in Kail's assertion that the government failed to prove that Maggi Kail was unavailable for cross-examination. To the contrary, it is apparent that the government made a good faith effort to obtain her presence at trial. *Ohio v. Roberts,* 448 U.S. 56, 74, 100 S.Ct. 2531, 2543, 65 L.Ed.2d 597 (1980). In fact, the government attempted unsuccessfully to subpoena Maggi Kail just prior to trial. It became apparent that she was avoiding service. As a consequence, the trial court's ruling that she was unavailable cannot be in question.

We would therefore conclude that the trial court did not err in admitting the commission ledger.

### G. *Restitution.*

Kail contends the district court's order of restitution that he pay $501,738 to thirty victims was excessive in that it exceeded the losses which were proved to have been incurred by the victims. 18 U.S.C. § 3579(a)(1) authorizes the district court to order the defendant to make restitution to "any victim of the offense." The Act does not require that the defendant be convicted of a count pertaining to that victim. Rather, the Act requires that the victim must have suffered a loss as a result of the offense charged. *See United States v. Ruffen,* 780 F.2d 1493, 1496 (9th Cir. 1985). In this case restitution was awarded to those victims named in the indictment. Moreover, the amounts of restitution to each of these victims was calculated using the commission ledger.

Kail asserts that the district court improperly relied on the restitution recommendation prepared by a probation officer whose findings as to losses were excessive. He also maintains that it included victim

losses which were not proved at trial. Even if we were not convinced that the losses were taken directly from the commission ledger which was in evidence at trial, we would conclude nevertheless that the trial court could properly rely on the report prepared by the probation officer. In *United States v. Florence,* 741 F.2d 1066 (8th Cir.1984), we stated: "[d]ue process does not mandate an evidentiary hearing to to establish the accuracy of the ... information contained in a presentence report before it can be considered by the trial court [to establish the amount of restitution]." *Id.* at 1069. In this case, the presentence investigation, including an addendum explaining the method of calculating restitution, was provided to the defendant in advance of sentencing. In addition, the court provided Kail with an opportunity to contest the amounts set out in the presentence report prior to the issuance of its restitution order. We would therefore conclude that the trial court's reliance on the presentence investigation was, under these circumstances, not unreasonable and did not constitute a violation of due process.

### III. CONCLUSION.

For all of the reasons stated above, we affirm the decision of the district court in this case.